Our first case for oral argument today is Harold v. Christensen. It is docket 23-4075. Mr. Sykes, we are prepared to hear your argument when you're ready. Well, that was a pleasure, Your Honor, to participate in that once again after 50 years. Please the court. My name is Robert Sykes. I'm a Salt Lake City, Utah, attorney. I have with me at counsel table Associate Peter Sorensen. And I'm honored to represent Joey Harold, sometimes in the paperwork he's referred to as Banner Benny. I'm also honored to be here with Peter Sterba, a longtime friend and colleague. We're always on the opposite side of cases, but he's a good man, a good lawyer. There are three issues that I think are important to focus on today. The first is, is a right clearly established where the force used against a nonviolent misdemeanant is so aggressive and so disproportionate that any reasonable officer would have fair warning that his actions would violate a person's right to be free from excessive force. Let me ask you a question that I oftentimes ask in these qualified immunity cases. What should the officers have done? Oh, very simple. Joey had his hands, and I watched this again this morning in the hotel room, his hands behind his back for about 14 or 15 seconds. So, OK, I'm going to be arrested, something like that. Put the handcuffs on him and take him away. Well, he's a large man with large wrists that may present some difficulty getting the handcuffs on. I don't. Are you saying that they deliberately delayed in putting the handcuffs on? What they did, Your Honor, is they deliberately did an improper, unconstitutional, forceful takedown in violation of many of your precedents, including Morris v. Snow. You don't do a forceful takedown on a nonviolent misdemeanant. What if he were breaking free? He no longer was going to keep his hands behind his back, because I've watched the videos, too, and I'm not sure what I see there. Well, you know what, that should go to a jury, by the way, what you recounted. We don't see it that way. Judge Newford didn't see it that way. He said, I think it's page 18 and 20, there was no justification, I'm paraphrasing now, to do a forceful takedown on this man. We agree with that. That's not the point at which we judge or decide whether the force used was excessive. The point that we judge that at is the point at which they actually had to use the force. Here, that wasn't at the point of the takedown. It was after the takedown. They're tumbling around. He's screaming. He's cursing. He's resisting. And ultimately, according to the judge, the district court, he says, Harold yells, Mr. Harold yells, don't effing touch me. And as he did so, as he did so, he pulled out of the grasp of Officer Christensen and Officer Gardner and was moving his arms towards Sergeant Christensen's upper body. That's the point at which we decide was the force excessive. Because according to the judge, it was immediately, and I'm quoting, immediately after, he pulled free that Mr. Christensen, for his weapon, and he used it. So we need to focus. I'd like you to focus on that point and explain to me what I thought I understood your argument to be, which was that this was an obvious constitutional violation. Now, there are two violations here. The forceful takedown, where he's got his hands behind his back. They didn't use force at that point. They used force. We have to evaluate it from the point at which they used force. And the second use of force is the gun. Now, that may be part of the evaluation, but it's not the only factor. Let me take you back for a minute to answer that question to Correa versus Baca. Another mentally ill individual, young man, mother calls for assistance. He comes back, sees the police, and takes off on his bicycle. They corral him, take him down forcefully, okay? He's thrashing around. And this court held, look, that doesn't justify tasing him ten times and beating him and killing him, okay? And I would suggest the same thing to you here. I'm sorry. Counsel, at that point, I believe in the case you're speaking of, at that point that the officers tased him, he had been subdued. And that's the real issue in each of these cases is, was the individual subdued when the officers took this action? And here, you've got specific findings of fact from the district court saying, not only was he not subdued, he'd broken away from two of the three officers, shouting, cursing, and was reaching for one officer's chest. That's the facts that you have to deal with. We can't reconsider those facts on appeal. Right. And Judge Newford, who heard the whole thing, said that did not justify a forceful takedown, and it didn't justify being shot in the eye with a JPX pepper gun. And by the way, you probably read this in the briefing, but that pepper gun emits a pepper ball at 405 miles an hour muzzle velocity, okay? It says on the gun, don't shoot anybody closer than five feet, okay? Now, I brought a tape measure, but I can't find it. But it's a Craftsman. It's red. It's about an inch and a quarter. And as that pepper ball goes forward, it expands. But at that range, 18 to 36 inches, it's about an inch and a quarter. What do you mean by ball? It's a pepper ball. My understanding is it's a spray. No, it's a pepper ball. And is that in this document? I don't remember, Judge, which one you have there. It's the JPX pepper gun professional. Yeah, it's a pepper ball. Several pages. It shows the emission spreading. But my understanding is it's a spray. It's a ball. And that's in the record. And it expands when it goes up. A ball expands? That's what it says. All right. The pepper ball, yeah. But either way, that's a very – it had to be going close to 400 miles an hour when it hit his eye. See, this is a nonviolent misdemeanor. He's mentally ill. Can we back up? And you shoot him in the eye. Let's back up. Please. He's on the ground. He's up against the officers. He's up against the wall. He's told, give us your other arm. They're trying to handcuff him. He's not giving that arm up. Yeah, it says he can't. One of the others says he can't. I'm going to get to that. All right. Let me finish. Okay. And at that point, what should the officers have done? My original question. There were several warnings given. Five or six times he was told, submit or else. And eventually the force was deployed. Well, what the officers should have done, and I think what our expert would say, is hold him until he calms down. But you don't shoot him. But sometimes you read cases where the person is held and is distraught and overwrought and dies. Yeah. And so is it just a no-win position? Well, if that happens, it happens. And I've had cases like that. Excuse me. I've had cases like that. But what you don't do is use a lethal weapon. And that thing you had up there, that's a brochure, says that this is lethal, deadly, inside of five feet. Okay. So if it had been five feet, would you still have a case or not? Well, if it had been five feet or more, probably not. Okay. But 18 to 24 inches. I've measured my own hand. If he's down like this and I'm holding it up, I can't get much more than about that far, see. And so what I'm saying is you don't use a lethal weapon on a nonviolent misdemeanant. You don't. Are the Taser cases applicable here? Well, that's excessive force. I think it's applicable. It's excessive force. It can be. The district court said you only gave him one case, unclearly established, the McWilliams case. Would we be within our realm to be piling new cases on? Well, I never got to my second and third issues, but here they are. I'll answer your question. Number one, is this a new issue? And number two, if it is, should you consider it anyway? Well, let me address the new issue. I read this very carefully. Our response to the motion for assembly judgment, pages 37 through 52, 15 pages, goes in at length about what the law is with respect to forceful takedowns and the use of force. And I said in there, I didn't write that brief, but we said, let me find my notes here, we talked about the gram factors. We cite cases, many cases, supporting the gram factors alone. We cite Casey, Cortez, McWilliams, and Morris v. Noe. And if you go to page 47 on that brief, we had a quote from Morris v. Noe about there will never be a previously published opinion involving exactly the same circumstances. The more obviously egregious the conduct in light of preventing constitutional principles, the less specificity is required. Now, we cited that. We cited Morris again on page 49. I think we adequately dealt with that. Now, looking back in hindsight, do I wish I had put, or whoever wrote this had put all those other cases in? Sure. But we were responding to their brief, and I think we responded adequately and let the court know that we didn't require a specific case on this situation because, number one, forceful takedown laws clearly established in the Tenth Circuit, going back almost 20 years. Counsel, can I stop you there? Yes. Are you taking the position that this was an obvious violation? Is that your argument? Yes. And that you raised that? Yes. And that all we needed was to show that the grand factors. Okay. So are you making the argument, then, that there is a case that showed that the right was or this was clearly established that it couldn't be done? Are you abandoning that argument? Or which way are you going? Clearly established with a case or two or three or whatever, or obvious? The grand factors clearly established, and we argue that in our brief. Okay. But there's no specific case that we found where someone shot in the eye with a pepper gun. Okay. So you're not making that argument that that was clearly established? No. You're saying the violation was obvious? Right. Okay. Thank you. And I would like to reserve a few minutes to respond to my good friend, Peter Sterba. So we've got 2.16 left. Is that okay? Yes. Okay. Unless you have a question I can answer right now. I'm going to stop your clock. Thank you. Thank you. May it please the Court, good morning, and good morning to Mr. Sykes and your colleague. This case arises from the fact that the lower court determined that the use of the pepper gun was such that there's no clear case or cases from this circuit, or other circuits for that matter, that would inform this officer that the discharge under the facts and circumstances that he did was constitutionally problematic. So what if he had shot from two inches? I don't think that that necessarily would change the circumstances, because if you look at this, the reason... So let me make sure I understand. You're saying that there would still be qualified immunity even then? Well, first, let's go back. There's no law. There's no case law. That's the first thing. But secondly, if you look at the facts and circumstances, which you have to do the totality of the circumstances precisely, you'll see that the reason why he did this, he testified in his deposition to this effect, is that after the whole circumstance of him throwing a can, him not being compliant, him struggling, him also taking a shelving and hitting the officer or attempting to hit the officers with it, and series of events like that, this officer made the determination that he had to deploy the gun to stop what was going on. I'm trying to get a line, though. And if you don't want to give me one, just say so. But if it were two inches, would that be qualified immunity or not? Well, I don't think that's the correct way of looking at it. Did the officer act reasonably in discharging the weapon or the gun, even if it was two inches, five feet, or ten feet? The point is, what was he trying to accomplish? Going back to, I think we cited the case of the woman who was stopped in her automobile, and she wouldn't get out of the car. And she said she wanted to talk to her mother. She said she'd get out if they promised they wouldn't hurt her. Pardon me? She said she'd get out if they promised they wouldn't hurt her. Well, that was one thing she said, but ultimately she would not comply, would not get out of the car. So the officer sprayed O.C. spray into her face, and that subdued her. That's exactly what the case said, that the use of this was reasonable because essentially it subdued a belligerent, hostile person and allowed the officers to address the situation. Do we care about the officer's motive here? In other words, this is going on. Of the three officers, I think the first one is as calm and sedate a person as you could ever have report to your house and was fantastic. And the one who was not, who was agitated, who arrived a little bit later, is our defendant. And he is the one who is involved in, I'm not going to say instigating, but he raises the temperature. And as the plaintiff is on the ground and he is being told by Officer Christensen, roll over so they can, the other deputy says he can't, at which point, and it's within moments, the shot, the eye, and also within moments is the plaintiff calls the officer an SOB, in not as polite terms. What if the officer were angry and he decided, I'm sick of you, I've spent enough time and it's been like one minute on the ground, this will show you, bang from three feet, would that be qualified immunity? If that was his motivation. Judge, and I apologize, when you say would that be qualified immunity, once again, you have to look at the complete circumstances under which the officer is functioning. And in this case. I'm trying to give you a big circumstance. Pardon me? I'm trying to give you a big circumstance to include in your complete circumstances. And that is to say the officer was angry?  Well, I think perhaps that would cause a question as to what the officer was precisely doing and whether he was reasonably in doing it. But the fact of the matter is, essentially, his anger or his motivation is somewhat irrelevant to the qualified immunity analysis. The issue is what he did, not what he was feeling, but what he did, was it reasonable under the Fourth Amendment? That's the standard. Is that in dispute on appeal, the excessive force part of the district court's ruling? I thought we were only talking about clearly established. Well, we're talking about the deployment of the pepper gun, which is a use of force. And we're talking about whether or not that was excessive under the Fourth Amendment. There's a couple other facts that I think are important. First of all, it's clear the trial court agreed with this, and the facts show it, that Officer Christensen, right when he deployed the pepper gun, was when the grasp of the officers, Mr. Harrell had gotten out of the grasp of two officers, Gardner and Christensen, and was going towards Christensen. And it looked like he was going to either assault him in some way or hit him in some way. That's a finding. I think it's finding 58 in the findings of the trial court's decision. So that was the moment that he deployed. And under the circumstances of this case, he had a right to defend himself. He had a right to worry about the safety of other individuals. He had a right to eliminate, if you will, or stop what he perceived was going to be assaultive behavior on behalf of Mr. Christensen. And remember, he had some basis to believe that because of the way Harrell had acted, throwing the can, swearing, not complying, struggling. And remember, this is important. You can see it in Truman's video. That's the best one. He takes the shelf. This is Harrell. Takes the shelf when he's on the ground and is going like this, attempting to whack these officers in the head. Christensen saw that. He knew that. And he was concerned about that. And somehow this situation had to end. And he ended it by the deployment of the pepper gun. He certainly tried to move as far back as he could, but he couldn't disengage because that creates some other problems. But that's all he was trying to do was to end it. And he did when basically he deployed it. I appreciate what you're saying, but I'm wondering if you can address the question, are we considering whether there was a violation here? Are we not just looking at the qualified immunity question? Well, the point is there's no cases on this. And the court said if you can't show any case law that would tell this officer what he was doing was violative of the Constitution, he's entitled to qualified immunity because the law is not clearly established. And quite frankly, if there are no cases, and otherwise what he has done is certainly within the realm of reasonableness, he's entitled to qualified immunity. Well, what is your position on the obviousness? Was it raised below? Is that something we can consider? No, I appreciate the question. We raised the issue of that that issue, and I think we cited the most recent case, which its name avoids me right now. But anyway, Osborne. And that case basically is sort of like this case. Below, the obvious case law was not cited. Get up on appeal, and then that surfaces. And the court said, sorry, basically you have a forfeiture. You haven't preserved the issue below. You can't raise it now. And also there was no attempt to argue plain error, so you have a double problem. And the court said that that issue has been waived. And that's actually generally the law in this circuit. There are circumstances, I understand, where in the court's discretion, where otherwise it hasn't been raised or it hasn't been preserved below, and there's no argument for plain error, the court still can consider, if it wishes to, a case on the merits. And essentially what we have done is we've tried to argue, assuming the court would like to go in that direction and determines that even though there's a forfeiture, it's still going to decide the merits of the case, we thought we would provide what otherwise is argument that what Officer Christensen did. And we're not really arguing the first prong of clearly established, but you have to look at this in the context of factually what happened and saying that the law, if anything, doesn't tell him that he's on notice and should know that what he was doing was violating the Constitution. And I really go back to that case with the car, because it's somewhat instructive. It's the same element, shall we say. It's OC spray, and he sprayed it in the woman's face. And all he was trying to do was get control. That's all he was trying to do, and the court says that. Well, that's all we were having here. All the officer was trying to do. And maybe he was misguided, and the outcome became a situation where Mr. Harrell unfortunately lost his eye. That was not his intent. He said he was trying to shoot for the side of the head, and he was trying just to end this altercation, which was actually becoming worse, not better, especially when Mr. Harrell is coming after him and has now gotten out of the grasp of two officers and is raising up, going towards him. Eric, are you talking about when he's on the ground or when he is going to be handcuffed? No, this is actually way after that. I'm talking about, and there's a finding 58, which the trial court... What's the answer? Pardon me? What are you talking about? I'm talking about that the officer had certainly a reasonable justification and belief... You said breaking the grasp. When are you talking about? Okay. When he's on the ground after the takedown, he's struggling, and the officers are trying to control him. And one of the officers was Officer Gardner, and he had a grip, I think, on one of his hands. And that grip or grab that he was able to get out of at the same time Mr. Harrell got out of the grip and the grab of Sergeant Christensen, and that's when he deployed. He didn't deploy before then. Well, we've all seen the video, and I guess it's conclusive. Let me ask you this. You're acting like this is the first time that anybody could have foreseen that this would happen, but in fact, Officer Christensen was trained with this device. Is that right? Yes, he was. He knew, don't fire at less than 5 feet. I don't know whether he knew precisely what would happen, but he was trained that way. That's true. And there was a policy in St. George that required the 5-foot rule. That's true. How does that enter into the obvious question? Because we have a lot of cases where there's been training, and we've considered that as part of the second prong of qualified immunity. Okay. Let me address this that way, and maybe I'm being helpful, and maybe I'm not. Actually, if you look at Hope versus Pelzer, what Justice Stevens used was not obvious. He used novel. And the reason why I think that's important is because as we've gotten to just obvious, I don't know what obvious means. It certainly doesn't give fair warning to an officer, especially where there's no case law, that somehow what he's doing is unconstitutional. If it's novel, that is to say completely unique, different, and separate, I guess that maybe is something you could understand. But obvious, I mean, you could say any fact pattern in some sense, especially if it's anew, is obvious. Can you speak to the training that I asked you about? How does that affect the analysis? There was training, and he was in violation of the training. Well, yeah, but in this case, he thought that he had no other choice, and he didn't have a taser because he couldn't carry both. So he thought this was his only logical way to end this altercation and this situation that he's confronting. And he was concerned if he didn't, that there were going to be greater complications for the officers involved, and especially when he's now out of the grasp of two officers and he's attempting to lunge forward to Officer Christensen. Those are the facts, and that's what the court found. We have film, and we can see that. As far as whether he was out of the grasp after he was on the ground and he was lunging at officers, we have film that will show that. Right, I understand that. Isn't that the district court's finding here? The district court made that finding here. Yes, it's finding 58. And he didn't use the word lunge. He said he got out of the grasp of the two officers and was going towards Officer Christensen when he deployed. That's what the court found. And I think that's certainly a good way to show reasonableness on the part of Christensen because, remember, he didn't deploy immediately. He kept saying, I'm going to shoot you in the face. And he saw, you know, he had the gun. He could see that. Harold saw that. He still didn't respond. And it was only when he thought, that is, Christensen thought he was going to be assaulted, that he deployed. And that helped to end this whole situation. The other thing that's critical, and there's a case, it's the Talby case. Christensen testified that he was, when they're struggling on the ground, he could feel that Harold was yanking for his, what he thought was his service revolver, which really was the pepper gun. And he could feel the yanking at his gun. Well, that's obviously, in Talby, the lady just brushes up against the back of the officer, and he spins around and pushes her to the ground. Well, I think everybody can concede it's a concern an officer has if somebody is going for their weapon. And that's what Christensen testified to. We don't have a finding from the district court about that, though. What do we do with that? I think that's an interesting fact. We didn't have any particular findings from the district court. Can we assume that that's what the fear was or what the threat was, that when he's lunging towards or moving towards the chest of Officer Christensen that he might have been able to obtain a weapon? Right, that's based purely on the testimony of Christensen and what you can see in the video. I'm just wondering, because we don't have a finding of facts. No, we don't have a finding. We're not in the business of finding facts. And I just, if I could, the other thing we don't have a finding on is the shelving and the use of the shelving by Mr. Harrell to hit the officers. I would say about the findings, they're not complete in some sense. The videos show most of the facts for sure, but I can't say that the findings are totally, the sum total of everything that happened. They're not. And so that's why it's not there. I personally can't see on the videos, and maybe somebody else can, but I can't see what the district court apparently saw, which was the final part where the officer uses the spray. You can't see that on the video, I don't believe, but the district court did make that specific finding. That's why I'm asking about it. Yes, he did. I mean, we can all look at the video, but in the end we can't do much about the district court's findings unless they're clearly not consistent with the record. I apologize. The one thing you can see clearly is not in the findings, which is my point. You can see the shelving going back and forth in an attempt to hit the officers, and that's in Truman's video where you see it best. So if there are any other questions or no other questions, I'll submit. Thank you. Thank you. I'd like to read you two-sentence paragraph, page 20 of the court's decision. In taking Mr. Harrell to the ground and deploying the pepper gun, Sergeant Christensen used a higher level of force than any apparent crime required. And on page 20, conclusion. Based upon the totality of the circumstances, Sergeant Christensen's deployment of the pepper gun at such a close proximity to Mr. Harrell's face was an excessive use of force under the Fourth Amendment. Now, by the way, Judge Phillips, my co-counsel, informed me that the gun is a spray, not a bolus, and I apologize for that. So what my good friend, Mr. Sterba, said in his brief and said up here, there's a whole bunch of new facts which justify the decision, but those facts aren't before you. They weren't appealed. This should go to a jury. Facts are part of the record. The facts are part of the record. What we work with at this level is the district court's factual findings. And that's why I've been asking you to focus on that. And so what he said, the totality of the circumstances, there's no basis for this. Now, let me just say that I don't have a lot of time here, but I'd like you to compare the Hodge versus Barger case, which is non-reported, to the Perea case. Hodge versus Barger, in a very short opinion, set out what the law is. And it said these facts of getting her out of the car, putting a pain hold on her, weren't enough to justify not having qualified immunity. But the judge that wrote that decision set out about four or five other cases, Judge Moritz, four or five other cases and explained how different that was. This case is like those other cases, grossly excessive for us. And I would like to just ask this court, in the interest of justice  requires it. I thank you for your attention very much. Thank you, counsel, for your helpful arguments. The case is submitted and counsel are excused.